**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| WESTERN ENERGY ALLIANCE and NORTH DAKOTA PETROLEUM COUNCIL )<br><br>Plaintiffs, )<br><br>v. )<br><br>U.S. DEPARTMENT OF THE INTERIOR, SALLY JEWELL, in her official capacity as Secretary, BUREAU OF LAND MANAGEMENT, a part of the U.S. Department of the Interior, NEIL KORNZE, in his official capacity as Director of the Bureau of Land Management, U.S. DEPARTMENT OF AGRICULTURE, TOM VILSACK, in his official capacity as Secretary, U.S. FOREST SERVICE, a part of the U.S. Department of Agriculture, THOMAS L. TIDWELL, in his official capacity as Chief, U.S. Forest Service )<br><br>Defendants. ) | Case No. 1:16 - CV - 112 |

**COMPLAINT**

      Plaintiffs Western Energy Alliance and the North Dakota Petroleum Council (collectively, the Alliance), by and through its undersigned counsel, respectfully submit this Complaint seeking declaratory and injunctive relief for violations of the Administrative Procedure Act (APA), Federal Land Policy and Management Act (FLPMA), Mineral Leasing Act (MLA), National Environmental Policy Act (NEPA), and National Forest Management Act (NFMA) and state as follows:

**INTRODUCTION**

      1.    This civil action is brought by the Alliance against the United States Department of the Interior (Department of the Interior); Sally Jewell, in her official capacity as Secretary of

the Department of the Interior (Interior Secretary); the United States Bureau of Land Management (BLM); Neil Kornze, in his official capacity as Director of the BLM; the United States Department of Agriculture (Department of Agriculture); Tom Vilsack, in his official capacity as Secretary of the Department of Agriculture (Agriculture Secretary); the United States Forest Service (Forest Service); and Thomas L. Tidwell, in his official capacity as Chief of the Forest Service (collectively, Federal Defendants) for multiple violations of federal law.

2.     The federal decisions and actions at issue involve federal land use plans and plan amendments covering approximately 165 million acres of land in the western United States. Federal Defendants developed these plans and plan amendments to manage greater sage-grouse and its habitat.   In promulgating these plans, the Federal Defendants designated a variety of habitat levels and imposed corresponding restrictions and prohibitions on new oil and gas leasing, and on development of valid existing leases.   These restrictions impact all of the oil and gas producing western states with greater sage grouse habitat.   North Dakota, for example, has the highest percentage of existing oil and gas leased acreage within these newly designated priority habitat areas and corresponding leasing and development restrictions of any other state in the West.   Yet, unlike other states that also have these new plans, the applicable federal land use plan in North Dakota does not provide for an adaptive management strategy to provide flexibility to future oil and gas development and operations based upon changed circumstances.

3.     The Federal Defendants promulgated these plans in a manner that unilaterally and substantively amended many BLM regulations implementing the MLA, which govern oil and gas leasing and development, without following the required formal rulemaking procedures of the APA.   These substantive unilateral amendments to existing regulations include Federal Defendants' removal of BLM's sole statutory and regulatory authority over oil and gas lease

stipulations and unlawful delegation of this exclusive authority to the United States Fish and Wildlife Service (FWS) and state game and fish agencies.

4.     In contravention of the formal rulemaking requirements of the APA, the Federal Defendants also unilaterally and substantively amended BLM's regulations governing minimization of adverse impacts, and imposed a significantly heightened and costly compensatory mitigation requirement and "net conservation gain" standard on oil and gas development.

5.     Federal Defendants also promulgated substantive rules and requirements imposing buffer distances, timing limitations, and noise restrictions on existing and new oil and gas leases and development, in violation of the APA.  Federal Defendants failed to analyze, explain, or otherwise justify these new restrictions and requirements, or even attempt to rationalize the arbitrary nature of why some restrictions and requirements are imposed in certain habitat designations in some states or geographic areas, but not within the same habitat designations or geographic areas located in different states.

6.     The Federal Defendants exempted certain renewable electric transmission projects from the various applicable designations and restrictions imposed by these plans.  Yet, the impacts from these exempted projects will still count against surface disturbance restrictions applicable to development activities by oil and gas companies and other public land uses and development industries on adjacent lands.  Despite acknowledging that significant impacts would result to greater sage grouse and its habitat from these exempted projects, the Federal Defendants nonetheless entirely fail to explain, analyze, or otherwise justify these exemptions.

7.     The inconsistent and disparate treatment of similarly situated industries within the same habitat designations without a rational or reasoned basis is the hallmark of arbitrary and capricious decision-making in violation of the APA.

## DECISIONS CHALLENGED

8.     This civil action challenges the Federal Defendants' final agency actions approving four Records of Decision (RODs), the associated approved amended or revised land use plans, and the underlying proposed land use plans and final environmental impact statements (EISs):

(a)     Record of Decision and Approved Resource Management Plan Amendments for the Rocky Mountain Region, including the Greater Sage-Grouse Sub-Regions of Lewistown, North Dakota, Northwest Colorado, Wyoming, and the Approved Resource Management Plans for Billings, Buffalo, Cody, HiLine, Miles City, Pompeys Pillar National Monument, South Dakota, Worland (BLM's Rocky Mountain ROD), which approved amended and revised land use plans including the following:

(i)     North Dakota Greater Sage-Grouse Approved Resource Management Plan Amendment (North Dakota Approved RMPA);

(ii)     Northwest Colorado Greater Sage-Grouse Approved Resource Management Plan Amendment (Northwest Colorado Approved RMPA);

(iii)     Lewistown Field Office Greater Sage-Grouse Approved Resource Management Plan Amendment (Lewistown Approved RMPA);

(iv)     Billings Field Office Approved Resource Management Plan (Billings Approved RMP);

4

    (v)     HiLine District Office Approved Resource Management Plan (HiLine Approved RMP);

    (vi)    Miles City Field Office Approved Resource Management Plan (Miles City Approved RMP);

    (vii)   Pompeys Pillar National Monument Approved Resource Management Plan (Pompeys Pillar Approved RMP);

(b)    Record of Decision and Approved Resource Management Plan Amendments for the Great Basin Region, including the Greater Sage-Grouse Sub-Regions of Idaho and Southwestern Montana, Nevada and Northeastern California, Oregon, Utah (BLM's Great Basin ROD), which approved amended land use plans including the following:

    (i)     Idaho and Southwestern Montana Greater Sage-Grouse Approved Resource Management Plan Amendment (Idaho/SW Montana Approved RMPA);

    (ii)    Nevada and Northeastern California Greater Sage-Grouse Approved Resource Management Plan Amendment (Nevada/NE California Approved RMPA);

    (iii)   Utah Greater Sage-Grouse Approved Resource Management Plan Amendment (Utah Approved RMPA);

(c)    Greater Sage-grouse Record of Decision for Idaho and Southwest Montana, Nevada and Utah (Forest Service's Great Basin ROD), which approved the following:

(i)     Idaho and Southwest Montana Greater Sage-grouse Land Management Plan Amendment (Idaho/SW Montana Approved LMPA);

(ii)    Nevada Greater Sage-grouse Land Management Plan Amendment (Nevada Approved LMPA);

(iii)   Utah Greater Sage-grouse Land Management Plan Amendment (Utah Approved LMPA);

(d)  Greater Sage-grouse Record of Decision for Northwest Colorado and Wyoming (Forest Service's Rocky Mountain ROD), which approved amended land management plans including the Northwest Colorado Greater Sage-grouse Land Management Plan Amendment (Northwest Colorado Approved LMPA);

(e)  North Dakota Greater Sage-Grouse Proposed Resource Management Plan Amendment and Final Environmental Impact Statement (North Dakota Proposed RMPA/Final EIS);

(f)  Northwest Colorado Greater Sage-Grouse Proposed Land Use Plan Amendment and Final Environmental Impact Statement (Northwest Colorado Proposed LUPA/Final EIS);

(g)  Lewistown Field Office Greater Sage-Grouse Proposed Resource Management Plan Amendment and Final Environmental Impact Statement (Lewistown Proposed RMPA/Final EIS);

(h)  Billings and Pompey's Pillar National Monument Proposed Resource Management Plan and Final Environmental Impact Statement (Billings Proposed RMP/Final EIS);

(i)     HiLine Proposed Resource Management Plan and Final Environmental Impact Statement (HiLine Proposed RMP/Final EIS);

(j)     Miles City Field Office Greater Sage-Grouse Proposed Resource Management Plan Amendment and Final Environmental Impact Statement (Miles City Proposed RMPA/Final EIS);

(k)     Idaho and Southwestern Montana Greater Sage-Grouse Proposed Land Use Plan Amendment and Final Environmental Impact Statement (Idaho/SW Montana Proposed LUPA/Final EIS);

(l)     Nevada and Northeastern California Greater Sage-Grouse Proposed Land Use Plan Amendment and Final Environmental Impact Statement (Nevada/NE California Proposed LUPA/Final EIS); and,

(m)     Utah Greater Sage-Grouse Proposed Land Use Plan Amendment and Final Environmental Impact Statement (Utah Proposed LUPA/Final EIS).

9.     The aforementioned RODs in paragraph 8 shall be collectively referred to as the Challenged RODs, the associated approved land use plans in paragraph 8 shall be collectively referred to as the Approved Challenged Plans, and the underlying Final EISs in paragraph 8 shall be collectively referred to as the Challenged Final EISs.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and the APA, 5 U.S.C. §§ 701-706 (judicial review of final agency action) to review Federal Defendants' violations of the FLPMA, MLA, NEPA and NFMA.  This Court can grant declaratory and injunctive relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 701-706, for violations of, *inter alia*, the APA.

7

11.     Venue lies in this Court under 28 U.S.C. § 1391(e).  Defendants BLM and the Forest Service have offices in the District of North Dakota.  The events and omissions complained of occurred in this District and federal lands and minerals situated in this District are subject to these actions.  Furthermore, the Alliance has members who operate on federal lands impacted by the challenged decisions within the District of North Dakota.

## THE PARTIES

12.     Western Energy Alliance represents over 450 companies engaged in all aspects of environmentally responsible exploration and production of oil and natural gas in the West.  Alliance members are independents, the majority of which are small businesses with an average of fifteen employees.

13.     The North Dakota Petroleum Council is a trade association that represents more than 475 companies involved in all aspects of the oil and gas industry including oil and gas production, refining, pipeline, transportation, mineral leasing, consulting, legal work, and oil field service activities in North Dakota and South Dakota.

14.     The Department of the Interior is an agency of the United States within the meaning of the APA.  5 U.S.C. § 551(1).

15.     Defendant Sally Jewell is the Interior Secretary and has ultimate responsibility for the BLM's greater sage-grouse plan amendments.

16.     BLM is an agency of the United States within the meaning of the APA.  5 U.S.C. § 551(1).

17.     Neil Kornze is the Director of BLM and has ultimate responsibility for administering the greater sage-grouse plan amendments on BLM lands.

18.     The Department of Agriculture is an agency of the United States within the meaning of the APA.  5 U.S.C. § 551(1).

8

19.     Defendant Tom Vilsack is the Agriculture Secretary and has ultimate responsibility for the Forest Service's greater sage-grouse plan amendments.

20.     The Forest Service is an agency of the United States within the meaning of the APA. 5 U.S.C. § 551(1).

21.     Thomas L. Tidwell is the Director of the Forest Service and has ultimate responsibility for administering the greater sage-grouse plan amendments on Forest Service lands.

## GENERAL ALLEGATIONS

### Legal Framework

**The National Environmental Policy Act (NEPA)**

22.     When BLM or the Forest Service promulgates a land use plan or plan amendment under FLPMA or NFMA, it must comply with the requirements of NEPA.

23.     NEPA is a procedural statute that does not mandate particular results, but requires federal agencies consider the impacts of its proposed actions. 42 U.S.C. § 4332.

24.     Under NEPA an agency must identify and publicly disclose the impacts of a proposed action on the environment and issue a fully informed and well-considered decision. *See* 40 C.F.R. § 1502.1.

25.     The major mechanism for review and public disclosure is through an Environmental Impact Statement (EIS). NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment" prior to undertaking that action. 42 U.S.C. § 4332 (2)(c); 40 C.F.R. § 1501.4.

26.     This means that federal agencies must consider, among other things, the cumulative economic and social effects of an agency decision upon the "human environment." 40 C.F.R. § 1508.14.

27.    The "human environment" includes economic and financial impacts on the people and communities affected by an agency decision.  *Id.*

28.    To ensure public involvement, before issuing a final EIS, the agency must prepare a draft EIS and submit it for public comment.  The draft EIS describes the purpose and need for the proposed action, the affected environment, the alternatives (including the preferred alternative or alternatives), the environmental impacts of those alternatives, and a description of the agency's consultation and coordination in developing the plan.  40 C.F.R. § 1502.9.

29.    The agency must provide at least 90 days for the public to comment on a draft EIS for a federal land use plan.

30.    The alternatives analysis is the "heart" of a NEPA document, and NEPA's implementing regulations emphasize an agency's duty to "[r]igorously explore and objectively evaluate all reasonable alternatives."  40 C.F.R. § 1502.16.

31.    The range of alternatives considered includes all reasonable alternatives and a no action alternative.  40 C.F.R. § 1052.14.

32.    NEPA and its implementing regulations require federal agencies to take a "hard look" at the environmental impacts of a proposed action.  42 U.S.C. § 4332(c)(i).

33.    This hard look must be based on public comment and the best available scientific information.

34.    An EIS must "provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.

35.     Under NEPA, federal agencies must consider the direct, indirect, and cumulative impacts of a project.  40 C.F.R. §§ 1508.7, 1508.8, 1508.25.

36.     NEPA requires federal agencies to supplement a draft EIS when there is substantial new information or substantially new alternatives considered, and to make that supplement available to the public for comment.

37.     NEPA requires a supplemental EIS when "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c).

38.     NEPA also requires federal agencies to disclose in a final EIS responsible opposing views that were not adequately discussed in the draft EIS and respond to the issues raised.  40 C.F.R. § 1502.9(b).

39.     NEPA's implementing regulations were promulgated by the Council on Environmental Quality (CEQ).

40.     The CEQ regulations prohibit agency predetermination by mandating that an agency must not commit resources that would prejudice selection of alternatives before making a final decision.

41.     This prohibition is necessary so that the final EIS serves as the means of assessing the environmental impacts of a decision and is not used solely as a tool to rationalize or justify decisions already made.

**The Administrative Procedure Act (APA)**

42.     Congress enacted the APA to standardize how federal agencies propose and establish rules and regulations.  Rulemaking procedures are outlined in the APA and require both

notice and the opportunity to comment when an agency proposes a substantive rule.  5 U.S.C. § 553.

43.     The APA defines a substantive rule as a "statement of general or particular applicability and future effect" that is "designed to implement, interpret, or prescribe law or policy."  5 U.S.C. § 551(4).

44.     The APA also allows an affected party to challenge final agency actions in federal court.  5 U.S.C. §§ 702, 704.

45.     The APA provides that a court "shall" set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, . . . [or] without observance of procedure required by law . . . ."  5 U.S.C. § 706(2)(A).

**Mineral Leasing Act (MLA)**

46.     The MLA grants the Interior Secretary exclusive authority to lease federal lands, including, with the Agriculture Secretary's consent, National Forest System lands, for oil and gas development.  *See* 30 U.S.C. § 226.

47.     The MLA also grants the Interior Secretary exclusive authority to administer operations on such mineral leases (subject to Forest Service supervision of surface use on National Forest System lands).  *See* 30 U.S.C. § 226(g).

48.     The Interior Secretary has delegated this authority exclusively to BLM.  *See* 43 C.F.R. pt. 3100; Dep't of the Interior Departmental Manual, 235 DM 1 § 1.1(K) (Oct. 5, 2009).

49.     The FWS does not have statutory or delegated authority to administer the development of federal oil and gas leases.

50.     Under BLM's delegated authority, BLM may attach lease stipulations to oil and gas leases and modify, waive or grant exceptions to these lease stipulations.  *See* 43 C.F.R. §§ 3101.1-3, 3101.1-4.

51.     Onshore Order No. 1 provides that Applications for Permits to Drill may "require reasonable mitigation measures to . . . minimize adverse impacts" in accordance with 43 C.F.R. § 3101.1-2. 75 Fed. Reg. 10328, 10334 (Mar. 7, 2007).

**Federal Land Policy and Management Act (FLPMA)**

52.     FLPMA requires that the federal government manage public lands under principles of multiple use and sustained yield in a manner that recognizes the nation's need for domestic sources of minerals, including implementation of the Mining and Mineral Policy Act of 1970.  43 U.S.C. § 1701(a)(12).

53.     FLPMA defines "multiple use" as "management of public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people" while providing a "combination of balanced and diverse resources uses . . . without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources."  43 U.S.C. § 1702(c).

54.     FLPMA defines "sustained yield" as the "achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use."  43 U.S.C. § 1702(h).

55.     FLPMA requires that in managing public lands, "the Secretary shall, by regulation or otherwise, take any action necessary to prevent the unnecessary or undue degradation of the lands."  43 U.S.C. § 1732(b).

56.     The Interior Secretary, with public involvement, must "develop, maintain, and, when appropriate, revise land use plans" providing for use of the public lands.   43 U.S.C. § 1712(a).

57.     Use of public lands must be consistent with land use plans, and, to prevent unnecessary or undue degradation, can be subject to conditions which minimize adverse impacts on resources and values (including fish and wildlife habitat); and minimize the period or method of such use.  43 U.S.C. § 1732(d)(2).

58.     Neither FLPMA nor its implementing regulations require compensatory mitigation. *See* 43 U.S.C. § 1712; *see also id.* §§ 1701, 1702

59.     FLPMA regulates the Interior Secretary's obligations to plan resource management, 43 C.F.R. § 1610, and provides regulatory guidance to BLM in administering the development of federal oil and gas resources, 43 C.F.R. § 3100.

60.     BLM's objective for resource management planning is to maximize resource values for the public through a "rational, consistently applied set of regulations and procedures" while promoting multiple use management and providing for public participation.  43 C.F.R. § 1601.0-2.

61.     FLPMA also requires federal agencies to provide adequate notice and opportunity to comment on land use plan amendments and revisions.  43 U.S.C. § 1712(f); 43 C.F.R. § 1610.2(a).

62.     BLM's planning regulations allow any person who participated in the planning process and who has an interest that may be adversely affected by the BLM's planning decisions to protest proposed planning decisions within 30 days after the notice of availability of the final EIS containing the proposed plan is published in the Federal Register.  43 C.F.R. § 1610.2.

63.     FLPMA mandates a substantive role for states and their governors in the federal land use planning process.  The Interior Secretary must coordinate the agency's land use inventory, planning, and management activities with those of the states and local governments where the lands are located.  43 U.S.C. § 1712(c)(9).

64.     FLPMA directs the Interior Secretary to make land use plans consistent with state and local plans "to the maximum extent" consistent with law.  *Id.*

65.     Consistent with this requirement, BLM's land use planning regulations provide for "Consistency Reviews" by governors.    The governors have 60 days to identify inconsistencies between federal land use plans and state plans and provide recommendations for changes to the federal plans.  Such recommendations will be accepted if the recommendations "provide for a reasonable balance" between national and state interests.  43 C.F.R. § 1610.3-2(e).

**National Forest Management Act (NFMA)**

66.     Congress enacted NFMA in 1976 requiring the Agriculture Secretary, acting through the Forest Service, to "assure" that natural forest plans "provide for multiple use and sustained yield" in accordance with the Multiple-Use Sustained-Yield Act of 1960 (MUSYA). 16 U.S.C. § 1604(e).

67.     "Sustained yield" is defined as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forest without impairment of the productivity of the land."  16 U.S.C. § 531(b).

68.     NFMA requires that the federal land management plans consider both environmental and economic interests, while taking into account the public's need for minerals.

69.     MUSYA declares that nothing within MUSYA shall be construed as affecting the jurisdiction or responsibilities of the states with respect to wildlife and fish in the national forests.

70.     The Agriculture Secretary is also obligated to provide for public involvement in the development of plan amendments and must make plan amendments available to the public for at least three months before final adoption, during which period the Agriculture Secretary must foster public participation in the review of plan amendments.  16 U.S.C. § 1604(d).

71.     Forest Service regulations require the agency consider state and local plans and identify opportunities to reduce conflicts between the state and federal plans.

72.     Under NFMA, if a forest plan amendment would result in a "significant change," to a plan, there must be adequate public involvement.  16 U.S.C. § 1604(f)(4).

73.     There is an exception to the public participation requirement, but only if Forest Service makes a supportable finding of non-significance of the revision.  *See* 16 U.S.C. § 1604(f)(4).

74.     Forest Service regulations govern the development of land use management plan amendments, like the Forest Service Approved Challenged Plans in this matter.

75.     NFMA also requires the Agriculture Secretary to promulgate regulations establishing procedures for the states to comment on standards, criteria, and guidelines formulated for Forest Service programs.

## Factual Background

76.     The greater sage-grouse (*Centrocercus urophasianus*) is the largest North American grouse species.  *See Endangered and Threatened Wildlife and Plants: 12-Month Findings for the Petitions to List the Greater Sage-Grouse as Threatened or Endangered*, 75 Fed. Reg. 13,910, 13,912 (March 23, 2010).

77.     During the spring breeding season, male sage-grouse congregate in leks and perform courtship rituals.  *Id.* at 13,915.

78.     There are an estimated 165 million acres of sage-grouse habitat across 11 western states:  Washington, Oregon, California, Nevada, Idaho, Montana, Wyoming, Colorado, Utah, South Dakota, and North Dakota.   The BLM manages 52 percent of sage-grouse habitat, the Forest Service manages approximately 8 percent, and state agencies oversee the rest of the habitat on state and private lands.  *Id.* at 13,920.

79.     States and their wildlife agencies have primary authority over the management of unlisted species, including the greater sage-grouse.

80.     Population numbers for greater sage-grouse are difficult to estimate due to the large range of the species, physical difficulty in accessing some areas, and the inconsistent sampling of leks in the past.  *Id.* at 13,921.

81.     The greater sage-grouse population is tracked by state agencies who count males on leks.

82.     States, local governments, associations, and private companies, including oil and gas operators, have voluntarily taken actions to conserve the greater sage-grouse and its habitat on federal, state and private lands.

83.     These conservation measures have been successful in improving greater sage-grouse populations.

84.     For example, on August 17, 2015 the Western Association of Fish and Wildlife Agencies (WAFWA), a state wildlife agency association, released data showing a 63 percent increase in the greater sage-grouse population over the previous two years, estimating the total greater sage-grouse breeding population at 424,645 male sage-grouse on known leks.  WAFWA uses the best available data, which are the state population numbers.

**National Planning Strategy**

85.     On March 23, 2010, the FWS found that the greater sage-grouse was warranted for protection under the Endangered Species Act (ESA) but was precluded by higher listing priorities.   75 Fed. Reg. 13,910.   In the finding, FWS also indicated that existing regulatory mechanisms were insufficient to protect the greater sage-grouse.

86.     In response to this finding, the Department of the Interior announced its National Greater Sage-Grouse Planning Strategy (National Planning Strategy) to amend, pursuant to FLPMA and NFMA, through a NEPA process, existing federal land use plans that cover greater sage-grouse habitat.   *See* BLM, Department of the Interior, Instructional Memorandum 2012-044, BLM National Greater Sage-Grouse Land-Use Planning Strategy (December 2011).

87.     The Forest Service coordinated with the BLM in a range-wide strategy to update existing land use plans within greater sage-grouse habitat.

88.     In June 2011, the BLM, Forest Service and FWS entered into a Memorandum of Understanding to coordinate on planning, resulting in the amendment of 98 federal land use plans to prevent the listing of the greater sage-grouse.   Interagency Agreement, FS Agreement Number: 11-IA-11132400-104 (June 2011).

89.     The FWS was under a court-ordered deadline of September 30, 2015 to determine either that a listing was not warranted, or that the greater sage-grouse was threatened or endangered under the ESA.

90.     Upon information and belief, the BLM and Forest Service had to rush its planning efforts in order to complete plan amendments in advance of the FWS's court-ordered September 30, 2015 deadline.

91.     Concurrent with BLM's 2010 announcement of the National Planning Strategy, BLM established the National Technical Team (NTT) to serve as an "independent, technical and

18

science-based team to ensure that the best information related to greater sage-grouse management is fully reviewed, evaluated and provided to the BLM for consideration in the land use planning process." Instruction Memorandum 2012-044, Appendix 1.

92.     On December 21, 2011, the NTT released "A Report on National Greater Sage-Grouse Conservation Measures," (NTT Report) outlining a "new paradigm" for activities conducted in greater sage-grouse habitat on BLM-managed lands. *See* NTT Report at 6.

93.     According to the authors, the NTT Report purportedly provides the latest science and best biological judgment to assist in making management decisions.

94.     The NTT Report encountered opposition from the states.   On May 16, 2013, WAFWA wrote to Interior Secretary Sally Jewell, noting that while the NTT Report provides valuable information, applying a one-size-fits-all approach is not appropriate for management variations that occur across the greater sage-grouse range.

95.     Similarly, the NTT Report encountered opposition from the scientific community. *See* Megan Maxwell, *BLM's NTT Report: Is it the Best Available Science or a Tool to Support a Predetermined Outcome?* (May 20, 2013); Rob Roy Ramey II, *Review of Data Quality Issues in A Report on National Greater Sage-Grouse Conservation Measures Produced by the BLM Sage-Grouse National Technical Team (NTT) Dated December 21, 2011* (Sept. 19, 2013).

96.     On March 18, 2015, the Alliance and a coalition of western counties and ranching, mining, and energy associations filed a Data Quality Act challenge against the NTT Report, arguing that the NTT Report failed to meet basic standards of science, resulted in misinformed policy, and advanced a one-sided narrative that is simply not supported by the full body of scientific literature and data regarding greater sage-grouse.

97.    On July 24, 2015, the Department of the Interior summarily dismissed the Alliance's Data Quality Act challenge and concerns that the NTT Report was biased in its presentation of available science, stating the concerns would be addressed in the final EISs and RODs.

98.    In 2013, the "Conservation Objectives Team" (COT), a group created by FWS and comprised of federal and state representatives, produced a report (COT Report) providing a state-specific approach to conservation, recognizing the benefit of state-based management practices, monitoring, and implementation to address state-specific issues.   The COT Report identified priority areas for conservation (PACs).

99.    The COT Report identified PACs as key habitats essential for sage-grouse conservation, described the principal threats to the greater sage-grouse in PACs, and identified the degree to which such threats should be reduced to effectively conserve the species.

100.   The COT Report also recommended that states put best management practices in place to address state and site-specific issues through monitoring and implementation.

101.   On March 18, 2015, the Alliance and a coalition of western counties and ranching, mining, and energy associations filed a Data Quality Act challenge against the COT Report, arguing that the COT Report failed to meet basic standards of science, resulted in misinformed policy, and advanced a one-sided narrative that is simply not supported by the full body of scientific literature and data regarding greater sage-grouse.

102.   On July 24, 2015, the Department of the Interior summarily dismissed the Alliance's Data Quality Act challenge and concerns that the COT Report was biased in its presentation of available science, stating the concerns would be addressed in the final EISs and RODs.

20

103.    The Department of the Interior failed to address the Alliance's concerns regarding the science utilized in the NTT and COT Reports in the EISs and RODs.

**State Conservation Plan Efforts**

104.    Concurrently with the National Planning Strategy, then-Interior Secretary Kenneth Salazar invited western governors, consistent with the requirements of FLPMA, to develop state-based conservation plans and state-based regulatory mechanisms aimed at avoiding the listing of the greater sage-grouse under the ESA.

105.    In reliance on the invitation by then-Interior Secretary Salazar, the governors of the states of Colorado, Idaho, Montana, North Dakota, Nevada, Oregon, South Dakota, Utah, and Wyoming initiated and renewed efforts to create state conservation plans, consistent with those state's extensive knowledge of greater sage-grouse observations, as well as stakeholder issues within their individual states.

106.    The state plans are specifically tailored for the conditions in the states, where habitat quality, sage grouse population characteristics, ecosystems, economic activities, threats, and other factors differ across the range.

107.    For example, the State of Wyoming revised its core area strategy, set forth in Wyoming Executive Order 2015-4:   Greater Sage-Grouse Core Area Protection (Wyoming Plan), adopting:  (1) a five percent disturbance cap; (2) no-surface occupancy (NSO) buffer lease stipulations within a 0.6-mile core habitat lek; (3) two-mile seasonal NSO buffer stipulations; and, (4) a 0.25-mile general habitat NSO lek buffer stipulation.

108.    The State of Montana adopted a plan to protect the greater sage-grouse and its habitat similar to the Wyoming Plan.  See Executive Order 10-2014 (Montana Plan).

109.     The State of Utah adopted a detailed conservation plan for greater sage-grouse (Utah Plan) establishing, among other things, a five percent disturbance cap on habitat within a greater sage-grouse management area.

110.     The State of Nevada adopted a comprehensive greater sage-grouse conservation plan (Nevada Plan), establishing management prescriptions and requirements specific to the needs of the state's greater sage-grouse population and habitat.

111.     Colorado Executive Order No. D2014-004, Conserving the Greater Sage-Grouse Habitat and the Colorado Greater Sage-Grouse Conservation Plan (the Colorado Plan), sought to develop localized sage-grouse working groups and plans, and the Colorado Oil and Gas Conservation Commission (COGCC) developed rules that apply to greater sage-grouse habitat. The COGCC rules impose NSO lease restrictions within 0.6 miles of a lek.

**Draft Federal Land Use Plans and Amendments**

112.     Throughout 2013 Federal Defendants released draft land use plan amendments (Draft Plans) and draft (EISs) according to the National Planning Strategy.  BLM and the Forest Service released the following draft documents:

(a)     Miles City Draft RMP and EIS, March 8, 2013;

(b)     HiLine District Draft RMP and Draft EIS, March 22, 2013;

(c)     Billings and Pompeys Pillar National Monument Draft RMP and EIS, March 29, 2013;

(d)     South Dakota Field Office Draft RMP and EIS, June 14, 2013;

(e)     Buffalo Draft RMP and EIS, June 28, 2013;

(f)     Supplement to the Bighorn Basin Draft RMP and EIS, Cody and Worland Field Offices, July 12, 2013;

(g)     Northwest Colorado Greater Sage-Grouse Draft RMP Amendment and Draft EIS, August 16, 2013;

(h)     North Dakota Greater Sage-Grouse Draft RMP Amendment and Draft EIS, September 27, 2013;

(i)     Utah Greater Sage-Grouse Draft Land Use Plan Amendments and EIS, November 1, 2013;

(j)     Nevada and Northeastern California Greater Sage-Grouse Draft Land Use Plan Amendments (LUPA) and Draft EIS, November 1, 2013;

(k)     Idaho and Southwestern Montana Greater Sage-Grouse Draft LUPA and Draft EIS, November 1, 2013;

(l)     Lewistown Field Office Greater Sage-Grouse Draft LUPA and Draft EIS, November 8, 2013;

(m)     Oregon Greater Sage-Grouse Draft LUPA and Draft EIS, November 26, 2013;

(n)     Wyoming Greater Sage-Grouse Draft LUPA and Draft EIS, December 27, 2013.

113.    The Alliance commented on the draft EISs referred to in paragraph 112; the North Dakota Petroleum Council joined in the Alliance's comments on the North Dakota Greater Sage-Grouse Draft RMP Amendment and Draft EIS.

**New Information Following the Close of the Comment Period**

114.    In September 2014, after the public comment period for the Draft Plans/Draft EISs closed, the FWS released a mitigation guidance titled "Greater Sage-Grouse Range-wide Mitigation Framework:  Version 1.0" (FWS Mitigation Framework).

115.    The FWS Mitigation Framework incorporated a "net conservation gain" mitigation standard and included a goal of "achiev[ing] a net positive" in conservation. FWS Mitigation Framework at 4.

116.    The FWS Mitigation Framework defined "net conservation gain" as "the actual benefit or gain above baseline conditions, after deductions for impacts, in habitat function or value to species covered by a mitigation program." *Id.* at 22.

117.    The FWS Mitigation Framework was incorporated into the Approved Challenged Plans but not made available for notice and public comment through an alternative in the draft or final EISs or presented to the public for meaningful review.

118.    On October 14, 2014, FWS Director Dan Ashe sent a memorandum to Defendants Kornze and Tidwell titled "Greater Sage-Grouse: Additional Recommendations to Refine Land Use Allocation in Highly Important Landscapes" (Ashe Memorandum).

119.    The Ashe Memorandum identified approximately 16.5 million acres representing so-called "stronghold" habitats for sage-grouse that, according to the memorandum, have been identified by the "conservation community" as the "best of the best" greater sage-grouse habitat.

120.    FWS did not consult with the affected states to confirm the accuracy of this information.

121.    The Ashe Memorandum's "strongholds" were incorporated into the Approved Challenged Plans as sagebrush focal areas, but were not made available for notice and public comment through an alternative in the draft or final EISs or otherwise presented to the public for meaningful review.

122.    On November 21, 2014, the United States Geological Survey (USGS) published a study entitled "Conservation Buffer Distance Estimates for Greater Sage-Grouse—A Review" (USGS Lek Buffer Study).

123.    The USGS Lek Buffer Study recommended a minimum lek buffer distance of 3.1 miles for surface disturbances, with a maximum lek buffer distance of 5 miles.

124.    The USGS Lek Buffer Study was incorporated into the Approved Challenged Plans but not made available for notice and public comment through an alternative in the draft or final EISs or presented to the public for meaningful review.

**Proposed Federal Land Use Plans and Amendments**

125.    In May 2015, BLM and the Forest Service released proposed land use plans (Proposed Plans) and final EISs encompassing greater sage-grouse habitat across the states of California, Colorado, Idaho, Montana, Nevada, North Dakota, Oregon, South Dakota, Utah, and Wyoming, including the Challenged Final EISs.

126.    The Final EISs evaluated several alternatives, including a "no action" alternative and alternatives based on findings from the NTT Report, conservation group recommendations, and alternatives developed by the Federal Defendants.

127.    In large part, these Proposed Plans/Final EISs analyzed components of the various state conservation plans. *See e.g.*, Utah Proposed LUPA/Final EIS (analyzing the State of Utah's greater sage-grouse conservation plan measures as an alternative).    Many of these state components, however, were not included in the Approved Plans.

128.    Combined, the management prescriptions in the Proposed Plans and Final EISs would restrict surface occupancy on new leases across 31 million acres of public land and would close an additional 2.8 million acres to oil and gas leasing.

**Protests and State Consistency Reviews**

129.    On June 29, 2015, the Alliance, in conjunction with the American Petroleum Institute and certain local oil and gas industry groups, submitted timely protests to the Proposed Plans/Final EISs for Billings-Pompey Pillars, Bighorn Basin, Buffalo, HiLine, Idaho/Southwest Montana, Lewistown, Miles City, Nevada/Northeastern California, North Dakota, Northwest Colorado, Utah, and the Wyoming 9-Plan region.

130.    The Alliance's protests noted that the Alliance supported BLM and the Forest Service's goal of managing the greater sage-grouse and its habitat but objected to the portions of the Proposed Plans which failed to balance conservation of the greater sage-grouse with FLPMA's multiple use and sustained yield requirements.

131.    Pursuant to 43 C.F.R. § 1610.3-2(e), the governors of Colorado, Idaho, and North Dakota filed consistency reviews on July 28, 2015; the governors of Montana, Nevada, Oregon, South Dakota, Utah, and Wyoming filed consistency reviews on July 29, 2015. These governor consistency reviews addressed glaring inconsistencies between the Proposed Plans/Final EISs, including the newly-included greater sage-grouse management prescriptions and restrictions and the proposed state plans.

132.    The BLM responded to all nine consistency reviews just one week later, on August 6, 2015, with a formulaic, template response.

133.    The BLM responded to, and outright rejected, the Alliance's protests of the Proposed Plans and Final EISs in September 2015 without providing any substantive reasoning or explanation for BLM's perfunctory rejection.

**Approved Federal Land Use Plans and Amendments**

134.    In September 2015, BLM issued two RODs and associated Approved RMPs and RMPAs, and the Forest Service issued two RODs and associated Approved LUPAs, including the Approved Challenged Plans.

135.    The Challenged RODs amended approximately 98 BLM and Forest Service land use management plans.

136.    The Challenged RODs and underlying approved plans (Approved Plans) were organized under two administrative planning regions: the Rocky Mountain Region and the Great Basin Region. The Rocky Mountain Region includes the BLM's resource management plans (RMPs) and amendments (and corresponding Forest Service LUPAs) in the states of North Dakota, South Dakota, Wyoming, Colorado, and portions of Montana. The Great Basin Region includes the BLM RMP amendments (and corresponding Forest Service LUPAs) in California, Nevada, Oregon, Idaho, Utah and portions of Montana.

137.    These RODs and underlying Approved Plans impose numerous restrictions on current and new federal oil and gas leases, and upon other public land users and developers, for the protection of greater sage-grouse habitat. These restrictions significantly reduce access to federal minerals in such habitat.

**Restrictions and Conservation Measures Impacting Oil and Gas Development**

138.    The conservation measures included in the Challenged RODs and associated Approved Plans consisted of land use designations and restrictions on greater sage-grouse habitat and management actions, and other conservation measures. *See, e.g.,* BLM's Great Basin ROD at S-1–S-2.

139.    BLM's RODs and Approved Plans incorporated significant conservation measures that were included in the Proposed Plans/Final EISs but not presented for public review

or analyzed in the Draft Plans/draft EISs or a supplemental EIS.  These prescriptions included the imposition of standardized, range-wide lek buffers based on the USGS Lek Buffer Study, designation of sagebrush focal area habitat zones based on the Ashe Memorandum, and the concept of a "net conservation gain" mitigation standard based on the FWS Mitigation Framework.

**Designation of Greater Sage-Grouse Habitat**

140.    The Challenged RODs and Approved Plans designated certain geographic areas as Priority Habitat Management Areas (PHMAs), General Habitat Management Areas (GHMAs), Important Habitat Management Areas (IHMAs), Other Habitat Management Areas (OHMAs), Restoration Habitat Management Areas (RHMAs), and Linkage and Connectivity Habitat Management Areas (LCHMAs).  BLM's Great Basin ROD at 1-15; BLM's Rocky Mountain ROD at 1-15.

141.    PHMAs are "BLM-administered lands identified as having the highest habitat value for maintaining sustainable GRSG populations."  BLM's Great Basin ROD at 1-15; BLM's Rocky Mountain ROD at 1-15.

142.    According to BLM's analysis, varying proportions of PHMA are leased across the range of the species:  20 percent of the PHMA designated in North Dakota is already leased for oil and gas development; 17 percent of PHMA in Colorado; 14 percent of PHMA in Wyoming; 4 percent of PHMA in Utah; and 2 percent of PHMA in Montana.  80 Fed. Reg. 59858, 59891 (Oct. 2, 2015).

143.    GHMAs are "BLM-administered [greater sage-grouse] habitat that is occupied seasonally or year-round and is outside of PHMAs, where some special management would apply to sustain [greater sage-grouse] populations."  BLM's Rocky Mountain ROD at 1-15.

144.    Sagebrush focal areas are a subset of PHMAs which correspond to areas identified as greater sage-grouse "strongholds" by FWS and the Ashe Memorandum, and are areas of "highest habitat value for [greater sage-grouse] and are managed to avoid new surface disturbance . . . ." BLM's Great Basin ROD at 1-16; BLM's Rocky Mountain ROD at 1-16–1-17.

145.    The Challenged Plans do not provide for consistent management of habitat, and impose inconsistent development parameters within designated habitat.

**Disturbance Caps on Development**

146.    Generally, BLM's Great Basin ROD imposes a disturbance cap of three percent within proposed project analysis areas in PHMAs. BLM's Great Basin ROD at 1-17, 1-21–1-22; *see also* BLM's Rocky Mountain ROD at 1-18, 1-23; Forest Service Great Basin ROD at 24; Forest Service Great Basin ROD at 23.

147.    BLM's Great Basin ROD imposes a three percent limit on disturbance in the Nevada/NE California Approved RMPA; however, the Nevada Approved RMPA provides for an exception allowing greater than three percent disturbance if BLM, the Nevada Department of Wildlife and the FWS unanimously find that the project could result in a net conservation gain. BLM's Great Basin ROD at 1-31; Nevada/NE California Approved RMPA at E-2.

148.    BLM's Great Basin ROD imposes a one percent cap on new human disturbance per decade in the Oregon Approved RMPA, not to exceed three percent disturbance at any time. BLM's Great Basin ROD at 1-22.

149.    BLM's Great Basin ROD provides for an exception in the Idaho/SW Montana Approved RMPA—covering the Montana portions only—permitting the disturbance limit to go from three percent to five percent when the Montana disturbance calculation method, as

developed by the Montana state plan, is instituted and effective.  BLM's Great Basin ROD at 1-31; Idaho/SW Montana Approved RMPA at E-4.

150.     Once Montana's disturbance calculation method is implemented, BLM's Rocky Mountain ROD permits the disturbance cap to increase from three percent to five percent in the state.  BLM's Rocky Mountain ROD at 1-32; *see also* Forest Service Great Basin ROD at 23.

151.     The Idaho/SW Montana Approved RMPA provides an additional exception to the disturbance cap in Montana, prohibiting any disturbance or habitat loss greater than five percent if associated with conversion to agricultural tillage or fire.  BLM's Rocky Mountain ROD at 1-32.

152.     In Idaho, the Idaho/SW Montana Approved RMPA prohibits any disturbance in a proposed project analysis area if the three percent cap is breached, until the disturbance level has been reduced below the three percent cap.  Idaho Approved RMPA at E-4.

153.     BLM's Rocky Mountain ROD imposes a human disturbance cap of five percent at the project-area scale in Wyoming.  BLM's Rocky Mountain ROD at 1-18, 1-31.

154.     Outside the greater sage-grouse plan amendment process, Colorado's White River Field Office Proposed Resource Management Plan Amendment/Final Environmental Impact Statement (WRFO Proposed RMPA/Final EIS) imposed a two percent surface occupancy limitation in GHMAs and PHMAs.  WRFO PRMPA/Final EIS Table 2.6.

**Density Caps on Development**

155.     Generally, BLM's Great Basin ROD imposes a density cap of one energy and mining facility per 640 acres within proposed project analysis areas in PHMAs.  BLM's Great Basin ROD at 1-17, Table 1-4, 1-22.

156.   BLM's Great Basin ROD does not impose a density cap for Nevada in the Nevada/NE California Approved RMPA.   BLM's Great Basin ROD at 1-32; Nevada/NE California Approved RMPA at E-4.

157.   Generally, BLM's Rocky Mountain ROD imposes a density cap of one energy and mining facility per 640 acres within PHMAs.   BLM's Rocky Mountain ROD at 1-18, 1-24.

158.   Forest Service's Great Basin ROD exempts most of Utah, Idaho, and Nevada from the one facility per 640 acres within PHMA requirement, but imposes it within the Anthro Mountain portion of Utah.   Forest Service Great Basin ROD at 40.

159.   Forest Service's Rocky Mountain ROD also imposes a density cap of one facility (in Colorado) every 640 acres, although it imposes a one "pad or mining operation" (in Wyoming) every 640 acres.   Forest Service Rocky Mountain ROD at 37.

**NSO Stipulations and Lek Buffers**

160.   BLM's Great Basin ROD allows for fluid mineral leasing in PHMA subject to a NSO stipulation, and prohibits and removes all opportunity for waiver, exception, or modification of the NSO stipulation.   BLM's Great Basin ROD at 1-17, Table 1-4.

161.   BLM's Rocky Mountain ROD allows for fluid mineral leasing subject to a NSO stipulation without waiver or modification, and only limited and restrictive exceptions.   BLM's Rocky Mountain ROD at 1-18, Table 1-4.

162.   Generally, both the BLM's Great Basin ROD and BLM's Rocky Mountain ROD apply lek buffers based on project type and location.   BLM's Great Basin ROD at 1-17, 1-23–1-24; BLM's Rocky ROD at 1-18, 1-25.

163.   Both BLM RODs indicate that lek buffers will be applied at the project-specific level and vary based on type of disturbance.   BLM's Great Basin ROD at 1-23–1-24; BLM's Rocky Mountain ROD at 1-25.

164.    Although the RODs indicate lek buffers would be applied at the project level, the Approved RMPAs establish and impose specific lek buffer distances based on disturbance type. *See, e.g.,* North Dakota Approved RMPA at B-1; Idaho/SW Montana Approved RMPA at G-5.

165.    For energy development related infrastructure, the Approved Plans generally provide for 3.1 mile buffers from leks. *See, e.g.,* North Dakota Approved RMPA at B-1; Idaho/SW Montana Approved RMPA at G-5.

166.    These standardized, range-wide lek buffers, and the USGS Lek Buffer Study on which they were based, were not presented for public review and comment or analyzed in the Proposed Plans/Final EISs.

167.    BLM did not analyze these new lek buffers in a supplemental EIS.

168.    BLM did not analyze the direct, indirect, or cumulative effects of these new lek buffers.

169.    BLM did not analyze the impact that the imposition of these new lek buffers would have on current or new federal oil and gas leases, mining, or other development activities on public lands.

170.    The Rocky Mountain ROD adopts different lek buffer distances in Wyoming. BLM's Rocky Mountain ROD at 1-18, 1-22 (imposing NSO stipulations within 0.6 miles of the perimeter of an occupied lek in PHMAs and within 0.25 miles of an occupied lek in GHMAs, consistent with the state's core area strategy).

171.    Colorado's WRFO PRMPA/Final EIS imposes a 0.6 mile NSO stipulation within active leks. WRFO PRMPA/Final EIS Table 2.6.

172.    A 0.6-mile NSO buffer has been recognized as being effective in the federal land use plans for Wyoming and Colorado's White River Field Office.

173.   BLM did not explain, or otherwise analyze, why inconsistent lek buffers were imposed upon the same habitat designations in different states.

**Adaptive Management Strategy**

174.   BLM's Great Basin ROD imposes an adaptive management strategy, including soft and hard triggers in each Approved RMPA.  BLM's Great Basin ROD at 1-29.

175.   BLM's Rocky Mountain ROD also imposes an adaptive management strategy, including soft and hard triggers in each Approved RMPA except North Dakota.  BLM's Rocky Mountain ROD at 1-29.

**Compensatory Mitigation and Net Conservation Gain**

176.   BLM's Great Basin ROD and BLM's Rocky Mountain ROD impose a requirement that all federally-authorized projects provide a net conservation gain to the greater-sage grouse.  BLM's Great Basin ROD at 1-25; BLM's Rocky Mountain ROD at 1-27.

177.   Pursuant to BLM's Great Basin ROD and BLM's Rocky Mountain ROD, if any actions will result in habitat loss and degradation after avoidance and minimization measures are applied, BLM will use compensatory mitigation projects to provide a net conservation gain to the greater sage-grouse.  BLM's Great Basin ROD at 1-25; BLM's Rocky Mountain ROD at 1-27. *See also* North Dakota Approved RMPA at 2-18 ("[T]o achieve a net conservation gain, the BLM will require compensatory mitigation when impacts cannot be adequately avoided and minimized, and residual impacts will result in habitat loss and degradation.").

178.   The net conservation gain standard was not presented for public review or analyzed in the Draft Plans.  This new standard was not analyzed in a supplemental EIS.

**Renewable Transmission Project Exemptions**

179.   BLM's Great Basin ROD and Rocky Mountain ROD generally prohibit high voltage transmission lines.  However, several "priority" renewable transmission line projects

already underway are exempted because BLM speculates that the projects "should achieve a net conservation benefit for GRSG." BLM's Great Basin ROD at 1-21; BLM's Rocky Mountain ROD at 1-23.

180.    The applicable Approved RMPAs categorize the TransWest Express (TransWest Project), the Gateway West and Gateway South (Gateway Projects), and the Boardman to Hemingway (Boardman Project) transmission line projects as "Priority Transmission Lines" which are not subject to the same avoidance areas designation as other transmission lines or comparable oil and gas development projects. Wyoming 9-Plan Approved RMPA at 61. *See also* Wyoming 9-Plan Proposed LUPA/Final EIS at 4-71 (describing TransWest Project and Gateway Projects as priority projects for the Obama Administration which are not subject to the proposed amendments).

181.    Consequently, the TransWest Project, Gateway Projects, and Boardman Project need not comply with the conservation measures outlined in the Approved Plans, including Required Design Features and avoidance criteria. *Id.*

182.    The TransWest Project is a proposed 600 kV electrical transmission line extending from south-central Wyoming to southern Nevada, and would cross PHMA and GHMA-designated habitat. Wyoming 9-Plan Proposed LUPA at 4-585.

183.    The Gateway South Transmission Line Project is a proposed 500 kV transmission line that would begin near Medicine Bow, Wyoming and extend towards Mona, Utah. Wyoming 9-Plan Proposed LUPA at 4-584.

184.    The Gateway West Transmission Line Project is a 230 kV and 500 kV transmission line projects between Glenrock, Wyoming and Melba, Idaho, and would cross

greater sage-grouse Core Areas in Wyoming.  Wyoming 9-Plan Proposed LUPA/Final EIS at 4-585.

185.    The Boardman Project is a proposed 500 kV electric transmission line extending between Boardman, Oregon to Melba, Idaho, and would cross PHMA and sagebrush focal area-designated habitat in Idaho.

186.    The TransWest Project, the Gateway Projects, and the Boardman Project are exempt from restrictions placed on other projects within PHMAs despite acknowledgement in the Approved RPMAs that the projects could have impacts to greater sage-grouse.

187.    For example, the Wyoming 9-Plan Proposed LUPA/Final EIS states that

> "impacts would likely be greater in Colorado where the TransWest Express proposed route would impact approximately 26 miles in PACs (key habitats that are essential for Greater Sage-Grouse conservation) and 57 miles of PHMA in the BLM Little Snake and White River Field Offices.  This impact would be especially harmful to fringe Greater Sage-Grouse populations in Colorado, as some are less robust than those in Wyoming and southern Montana."

Wyoming 9-Plan Proposed LUPA at 4-563.

188.    While exempt from disturbance cap restrictions and other requirements, these projects still count against disturbance caps imposed on oil and gas projects as well as other development projects and industries.  Wyoming 9-Plan LUPA at 2-27.

**Additional Required Stipulations and Restrictions**

*Ambient Noise*

189.    The Nevada, Idaho, and North Dakota Approved RMPA's all prohibit noise exceeding ten decibels above ambient noise levels, but during different time frames and at differing distances.  The Nevada/NE California Approved RMPA prohibits noise restrictions are for at least 0.25 miles from active and pending leks, from two hours before to two hours after sunrise and sunset during the breeding season.  Nevada/NE California Approved RMPA at 2-9.

190.    The Idaho/SW Montana Approved RMPA restrictions cover areas within two miles of leks during the entire lekking season.  Idaho/SW Montana Approved RMPA at C-2.

191.    The North Dakota Approved RMPA imposes its restrictions at sunrise at the perimeter of a lek during active lek season.  North Dakota Approved RMPA at C-4–C-5.

### *Timing Stipulations on Oil and Gas Development*

192.    BLM imposes timing limitation stipulations on disturbances related to oil and gas development.  BLM's Great Basin ROD at 1-23; BLM's Rocky Mountain ROD at 1-18, 1-24.

193.    The Utah Approved RMPA imposes a NSO stipulation in PHMA breeding habitat between February 15 and June 15.  Utah Approved RMPA at G-5.

194.    The Northwest Colorado Approved RMPA prohibits construction, drilling or completion within four miles of active leks between March 1 and July 15.  Northwest Colorado Approved RMPA at G-5.

195.    The Idaho/SW Montana Approved RMPA imposes seasonal Required Design Features, including avoiding mechanized anthropogenic disturbance in nesting habitat during the nesting season and during winter in wintering areas.  Idaho/SW Montana Approved RMPA at C-2.

196.    In Wyoming, NSO stipulations are imposed within 0.6 miles of occupied leks in PHMAs between March 15 and June 30.  BLM's Rocky Mountain ROD at 1-18.

197.    Colorado's WRFO PRMPA/Final EIS imposes timing restrictions for winter habitat—December 1 through March 15—and nesting and brood-rearing habitat—April 1 through July 15—within PHMAs or GHMAs.  WRFO PRMPA/Final EIS Table 2.6.

36

**Lease Deferrals and Project Denials**

198.    The Colorado BLM State Office recently denied a company's access to valid existing oil and gas leases in Northwest Colorado on the sole basis that these leases fell within lands designated as PHMAs under the applicable Approved Plan.

199.    BLM is not processing or deferring processing of pending drilling permits on valid existing leases due to the presence of greater sage-grouse habitat in Utah, Wyoming, Colorado and North Dakota.

200.    BLM has deferred leasing of more than 8 million acres of federal lands and minerals nominated for oil and gas leasing in PHMA designated in Colorado, Utah, Nevada, Montana, North Dakota, South Dakota, and Wyoming due to the National Planning Strategy, according to data compiled by the Associated Press.

201.    BLM's oil and gas lease deferrals have continued after the issuance of the Challenged RODs and Approved Plans.

202.    For example, the BLM in Montana recently deferred the sale of an additional 60,000 acres of leases in greater sage-grouse habitat, nominated by oil and gas companies.

203.    The BLM has not explained why these leases have been deferred nor has the agency given a timeline of when these leases will be available for auction at a regularly-scheduled lease sale.

## FIRST CAUSE OF ACTION

**(Federal Defendants failed to conduct a formal rulemaking under the APA to modify availability of exceptions, waivers, and modifications)**

204.    Plaintiffs incorporate by reference each of the allegations set forth above.

205.    The APA requires agencies to comply with formal rulemaking procedures when an agency proposes a substantive rule. *See* 5 U.S.C. § 533.

206.    Federal Defendants must provide notice of a proposed rulemaking, provide the public an opportunity to participate in the rulemaking, publish the resulting rule, and provide interested parties the right to petition for repeal of the rule. *See* 5 U.S.C. § 533.

207.    The land use plan revision or amendment process under FLPMA is not a substitute for the APA's formal rulemaking process.

208.    Congress granted the Interior Secretary exclusive authority to administer operations on federal oil and gas leases (subject to Forest Service supervision of surface use on National Forest System lands). *See* 30 U.S.C. § 226.

209.    The Interior Secretary delegated this authority exclusively to BLM. *See* 43 C.F.R. pt. 3100; Dep't of the Interior Departmental Manual, 235 DM 1 § 1.1(K) (Oct. 5, 2009).

210.    Under the MLA and its implementing regulations, BLM has developed a comprehensive regulatory program for administering the development of federal oil and gas resources, including the exception, waiver, or modification of lease stipulations.

211.    The MLA's implementing regulations require BLM to grant modification or waiver of a lease stipulation "only if the <u>authorized officer</u> determines" that one of two conditions exist. *See* 43 C.F.R. §§ 3101.1-3, 3101.1-4 (emphasis added).

212.    The "authorized officer" is defined as any employee of the BLM authorized to perform the duties described in Group 3000 and 3100 of Title 43; it does not include an employee of another federal agency or a state agency. 43 C.F.R. § 3000.0-5(e).

213.    The regulation provides that BLM <u>alone</u> determines whether these circumstances exist. 43 C.F.R. § 3101.1-4 (emphasis added).  There is no authority for BLM to delegate responsibility to authorize exceptions, waivers or modifications of lease stipulations.

214.    The Challenged RODs and Approved Challenged Plans unilaterally and improperly amend these regulations by providing that, in PHMA, BLM may only grant a one-time waiver of an NSO lease stipulation (known as an exception) if the BLM, the appropriate state wildlife agency, <u>and</u> FWS unanimously find that certain criteria are met. *See, e.g.,* Northwest Colorado Approved RMPA at G-3 to G-4.

215.    By categorically prohibiting BLM from modifying or waiving NSO stipulations, and by requiring that FWS and the appropriate state agency find that an exception to the NSO stipulation in PHMA is warranted, the Challenged RODs and Approved Challenged Plans improperly, unilaterally, and substantively amend BLM regulations related to BLM's sole authority to issue modifications and waivers of lease stipulations. 43 C.F.R. § 3101.1-4.

216.    These are substantive rules that require formal rulemaking pursuant to the APA.

217.    The Challenged RODs and Approved Challenged Plans prohibit waivers and modifications of lease stipulations in direct contradiction of BLM's own regulation stating that lease stipulations "shall be subject to modification or waiver." *Id.*

218.    By categorically prohibiting BLM from granting more than one exception to a stipulation, the Challenged RODs and Approved Challenged Plans improperly, unilaterally, and substantively amend BLM regulations related to authority to issue modifications and waivers of lease stipulations. 43 C.F.R. § 3101.1-4.

219.    In addition, Federal Defendants cannot amend BLM regulations through the land use process instead of following proper APA formal rulemaking procedures, including notice and public comment requirements. *See* 5 U.S.C. § 533.

220.    Federal Defendants' failure to follow APA's formal rulemaking procedure is an abuse of discretion, not in accordance with law, and without observance of procedure required by law.

## SECOND CAUSE OF ACTION

**(Federal Defendants failed to conduct a formal rulemaking under the APA regarding the compensatory mitigation requirement)**

221.    Plaintiffs incorporate by reference each of the allegations set forth above.

222.    Federal oil and gas leases vest lessees with "the exclusive right to drill for, mine, extract, remove and dispose of all the oil and gas" subject to the lease.   BLM Form 3110-11 – Offer to Lease and Lease for Oil and Gas (2008).

223.    The MLA's implementing regulations require lessees only "to <u>minimize</u> adverse impacts to other resource values . . . ." 43 C.F.R. § 3101.1-2 (emphasis added).

224.    Similarly, the BLM standard oil and gas lease only requires that lessees "conduct operations in a manner that <u>minimizes</u> adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land users."   BLM Form 3110-11 – Offer to Lease and Lease for Oil and Gas § 6 (2008) (emphasis added).

225.    The term "mitigation" does not appear in FLPMA or BLM's implementing regulations, and is not defined in the Forest Service's planning regulations.   Onshore Order No. 1 does provide that Applications for Permits to Drill may "require reasonable mitigation measures to . . . minimize adverse impacts" in accordance with 43 C.F.R. § 3101.1-2. 75 Fed. Reg. 10334.

226.    The CEQ identifies five categories of mitigation.   40 C.F.R. § 1508.20 describes one of the five categories, minimization of impacts, as "limiting the degree or magnitude of the action at its implementation . . . ." 40 C.F.R. § 1508.20(b).

227.    The CEQ identifies "[c]ompensating for the impact by replacing or providing substitute resources or environments" as a separate form of mitigation.  *See* 40 C.F.R. § 1508.20(e).

228.    The BLM's regulations only require lessees to minimize impacts.  43 C.F.R. § 3101.1-2.

229.    Nothing in the BLM lease form requires compensatory mitigation.

230.    Nothing in BLM's regulations requires compensatory mitigation.

231.    Nothing in the Forest Service's regulations requires compensatory mitigation.

232.    All of the Challenged RODs and Approved Challenged Plans require compensatory mitigation "sufficient to ensure a net conservation gain" for impacts to the greater sage-grouse and its habitat, including on new and existing leases.  Therefore, compensatory mitigation is a generally-applicable requirement and not based on subsequent site-specific determinations.

233.    Because neither FLPMA, the MLA, nor their implementing regulations require compensatory mitigation, the requirement cannot be characterized as an interpretation of existing law. *See* 43 U.S.C. § 1712; *see also id.* §§ 1701, 1702; 43 C.F.R. § 3101.1-2.

234.    The Challenged ROD's and Approved Challenged Plans' requirement that lessees provide compensatory mitigation for impacts to greater sage-grouse and its habitat unilaterally and substantively amends the BLM regulations governing oil and gas leases.

235.    The Challenged ROD's and Approved Challenged Plans' requirement to provide compensatory mitigation imposes a new duty on lessees.

236.     Federal Defendants' requirement that lessees provide compensatory mitigation is a substantive rule requiring compliance with the APA's formal rulemaking procedures, including notice and the opportunity for public comment.

237.     Federal Defendants violated the APA by substantively and unilaterally amending regulation to require compensatory mitigation for impacts to the greater sage-grouse and its habitat in violation of the APA's formal rulemaking procedure. *See* 5 U.S.C. § 533.

238.     Federal Defendants' failure to follow the APA's formal rulemaking procedure is an abuse of discretion, not in accordance with law, and without observance of procedure required by law.

**THIRD CAUSE OF ACTION**

**(Federal Defendants failed to conduct a formal rulemaking under the APA to require a "net conservation gain" mitigation standard)**

239.     Plaintiffs incorporate by reference each of the allegations set forth above.

240.     The "net conservation gain" mitigation standard included in the Challenged RODs and Approved Challenged Plans applies to all oil and gas lessees operating in greater sage-grouse habitat, regardless of impact.

241.     The Challenged RODs and Approved Challenged Plans impose this mitigation standard as a generally-applicable requirement—for current and new leases—and not based on a subsequent, site-specific determination.

242.     The Challenged RODs and Challenged Final EISs define "net conservation gain" as "[t]he actual benefit or gain above baseline conditions." *E.g.*, Northwest Colorado Proposed LUPA/Final EIS at Glossary-22.

243.    The "net conservation gain" mitigation standard unilaterally and substantively amends BLM regulations and the rights and obligations of existing lessees by requiring that they provide mitigation to a standard not previously required.

244.    The BLM NEPA Handbook defines mitigation as measures that can "reduce or avoid adverse effects to biological, physical, or socioeconomic resources." BLM Handbook H-1790-1 – NEPA at Glossary, pg.133 (Rel. 1-1710 01/30/2008) (emphasis added).

245.    FLPMA and BLM regulations do not require compensatory mitigation of oil and gas impacts. *See* 43 U.S.C. §§ 1701, 1702, 1712. These authorities cannot be construed to require that mitigation achieve a "net conservation gain" mitigation standard.

246.    The requirement that land users provide resources to achieve "benefit[s] or gain[s] above baseline conditions" as provided in the Approved Plans modifies commonly accepted definitions of mitigation. 43 C.F.R. § 3101.1-2; *see* Northwest Colorado Proposed LUPA/Final EIS at Glossary-22 ("net conservation gain" definition).

247.    "Mitigation" is generally considered as the restoration of conditions back to the baseline, not in excess of the baseline. 43 C.F.R. § 3101.1-2; BLM Form 3110-11.

248.    The term "mitigation" does not appear in FLPMA or BLM's implementing regulations, and is not defined in the Forest Service's planning regulations. Onshore Order No. 1 does provide that Applications for Permits to Drill may "require reasonable mitigation measures to . . . minimize adverse impacts" in accordance with 43 C.F.R. § 3101.1-2. 75 Fed. Reg. 10334.

249.    BLM and Forest Service NEPA regulations do not offer an alternative definition. *See* 36 C.F.R. §220.3; 43 C.F.R. § 46.30.

250.    The "net conservation gain" mitigation standard exceeds the regulatory definition of mitigation. 43 C.F.R. § 3101.1-2.

251. By imposing the "net conservation gain" mitigation standard, Federal Defendants acted as legislators by unilaterally and substantively amending BLM regulations. As a result, this "net conservation gain" standard is a formal, substantive rule requiring notice and comment under the APA.

252. Federal Defendants violated the APA by failing to conduct formal rulemaking to change the current regulations governing mitigation of oil and gas development.

253. Federal Defendants' failure to follow the APA's formal rulemaking procedure is an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law.

## FOURTH CAUSE OF ACTION

**(Federal Defendants failed to conduct a formal rulemaking under the APA for substantive new rules requiring specific lek buffer distances, timing limitations and noise buffers)**

254. Plaintiffs incorporate by reference each of the allegations set forth above.

255. BLM's Great Basin ROD and BLM's Rocky Mountain ROD impose lek buffers surrounding certain greater sage-grouse habitat—including for new and existing leases—imposing this as a generally-applicable requirement regardless of geographic location, and not based on subsequent site-specific determinations by Federal Defendants.

256. BLM's Great Basin ROD and BLM's Rocky Mountain ROD impose certain and specific timing limitations related to development within specified greater sage-grouse habitat—including for new and existing leases—imposing this as a generally applicable requirement regardless of geographic location, and not based on subsequent site-specific determinations by Federal Defendants.

257. BLM's Great Basin ROD and BLM's Rocky Mountain ROD impose noise buffers surrounding the greater sage-grouse and its habitat—including for new and existing

leases—imposing this as a generally applicable requirement regardless of geographic location, and not based on subsequent site-specific determinations by Federal Defendants.

258.    These substantive requirements—the lek buffer distances, timing limitations and noise buffers—impose categorical baseline limitations in all greater sage-grouse management and planning areas regardless of geographic location, and are not based on site-specific determinations.

259.    These substantive requirements—the lek buffer distances, timing limitations and noise buffers—are substantive rules that unilaterally and substantively amend the rights and obligations of existing lessees by imposing restrictions on future development not previously required.

260.    By imposing these specific, quantitative thresholds, Federal Defendants acted in a classically legislative fashion to form new substantive rules rather than interpret existing regulations.

261.    Federal Defendants violated the APA by failing to adhere to the APA's formal rulemaking procedures in promulgating the substantive rules requiring specific lek buffer distances, timing limitations and noise buffers in violation of the APA's formal rulemaking procedure. *See* 5 U.S.C. § 533.

262.    Federal Defendants violated the APA by failing to provide the opportunity for public notice and comment on the substantive rules requiring specific lek buffer distances, timing limitations, and noise buffers.

263.    Federal Defendants' failure to follow the APA's formal rulemaking procedure is an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law.

## FIFTH CAUSE OF ACTION

### (Federal Defendants disparate treatment between public land users and developers is arbitrary and capricious in violation of the APA)

264.    Plaintiffs incorporate by reference each of the allegations set forth above.

265.    The APA requires courts to set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2).

266.    BLM's resource management planning regulations require BLM to apply a "rational, consistently applied set of regulations and procedures" to maximize resource values for the public. 43 C.F.R. § 1601.0-2.

267.    The Approved Challenged Plans are the antithesis of rational, consistently applied regulations and procedures because the Nevada, Idaho, Utah and Northwest Colorado Final EISs and Challenged RODs expressly exempt the TransWest Project, Gateway Projects, and Boardman Project, which Federal Defendants acknowledged will have a significant impact on greater sage-grouse, from the Plans' species and habitat management prescriptions and development limitations while simultaneously imposing development restrictions on adjacent or nearby oil and gas leases to account for disturbance resulting from these exempt projects.

268.    The Challenged RODs exempt certain electric transmission projects from habitat development mitigation restrictions while still counting their surface-impact effects against the disturbance caps imposed on the oil and gas industry in the Nevada, Idaho, Utah, and Northwest Colorado final EISs and Approved Plans.

269.    The Nevada, Idaho, Utah, and Northwest Colorado final EISs and the Challenged RODs fail to explain, substantiate, and analyze why the inconsistent and disparate treatment between industries and public land developers is warranted.

270.    The Nevada, Idaho, Utah, and Northwest Colorado final EISs fail to explain, substantiate, and analyze the inconsistent and disparate treatment of the renewable transmission projects and other natural resource development industries.

271.    The Nevada, Idaho, Utah, and Northwest Colorado final EISs' and RODs' inconsistent and disparate treatment of similarly situated industries and development projects within the same habitat areas is the hallmark of a decision that is arbitrary, capricious, and contrary to law in violation of the APA.

272.    Federal Defendants' decision to expressly exempt certain renewable electric transmission projects from habitat management prescriptions and restrictions without analyzing and explaining the exemptions is arbitrary, capricious, and an abuse of discretion.

### SIXTH CAUSE OF ACTION

### (Federal Defendants failed to prepare a supplemental EIS in violation of NEPA, FLPMA, and NFMA)

273.    Plaintiffs incorporate by reference each of the allegations set forth above.

274.    When an agency makes substantial changes to a proposed action that are relevant to environmental concerns and bearing on the proposed action or its impacts, NEPA requires federal agencies to develop a supplemental EIS and make it available for public comment.    40 C.F.R. § 1502.9(c)(1); CEQ 40 Most Asked Questions, Question 32, 46 Fed. Reg. 18026 (Mar. 23, 1981).

275.    FLPMA requires federal agencies to provide adequate notice and opportunity to comment on land use plan amendments and revisions.    43 U.S.C. § 1712(f); 43 C.F.R. § 1610.2(a).

276.    NFMA also requires that federal agencies provide for public participation in the development and revision of land management plans.  16 U.S.C. § 1604(d).

277.   Federal Defendants included significant new substantive management prescriptions, including sagebrush focal area habitat zones and substantive new development restrictions including uniform lek buffers, all after close of comments on the Draft Plans.

278.   Federal Defendants did not provide an opportunity for notice and public comment on these new substantive prescriptions, nor did they provide an explanation as to why these significant new additions were made.

279.   Federal Defendants failed to explain why the new and substantive management prescriptions and restrictions were added to the Proposed Plans without preparing a supplemental EIS or otherwise providing the public with notice and an opportunity to comment.

280.   Federal Defendants designated sagebrush focal area habitat zones in the Proposed Plans after the close of comments on the Draft Plans, without providing an opportunity for notice and public comment, and without providing an explanation as to why the sagebrush focal area habitat zones were added in the challenged EISs.

281.   The sagebrush focal area habitat zones add a significant additional layer of regulations and restrictions on development in greater sage-grouse habitat to an already comprehensive regime of restrictions and regulations.

282.   The sagebrush focal area habitat zones originate from the Ashe Memorandum, which was not subject to public notice or comment, and include vastly more significant and restrictive requirements than PHMAs.

283.   Federal Defendants imposed categorical 3.1-mile lek buffers after the close of comments on the Draft Plans without providing an opportunity for notice and public comment and without providing an explanation as to why the uniform lek buffers were added in the Proposed Plans/Final EISs.

284. The categorical 3.1-mile lek buffers originate from the USGS Lek Buffer Study, which was not subject to notice and public comment.

285. Federal Defendants' imposition of these wholly new and significant management prescriptions and restrictions in the Challenged RODs and Approved Challenged Plans collectively and substantially modified how the Approved Challenged Plans would operate to regulate oil and gas development across the greater sage-grouse range without providing any analysis in the Proposed Plans/Final EISs.

286. These significant new and substantial management prescriptions were not analyzed within the range of alternatives discussed at the draft EIS stage for the Approved Challenged Plans.

287. These significant new and substantial management prescriptions are relevant to environmental concerns and valid existing rights, and significantly impact the Challenged RODs' and Approved Challenged Plans' direct, indirect and cumulative impact analysis presented in the Draft Plans.

288. Federal Defendants violated NEPA and its implementing regulations by failing to prepare supplemental EISs that fully disclosed and analyzed the substantive new components included in the Challenged RODs and Approved Challenged Plans in response to the Ashe Memorandum and the USGS Lek Buffer Study. 40 C.F.R. § 1502.9(c)(1).

289. Federal Defendants violated NEPA by failing to provide for notice and public comment of these substantive new components and by failing to explain in the Proposed Plans/Final EISs, Challenged RODs, or Approved Challenged Plans why these components were added. *Id.*

290.    Federal Defendants violated NEPA by failing to analyze the direct, indirect and cumulative impacts of these substantive new management prescriptions in the Proposed Plans/Final EISs, Challenged RODs, or Approved Challenged Plans.

291.    Federal Defendants also violated FLPMA and NFMA by failing to provide for notice and public comment of these substantive new components in the Challenged RODs and Approved Challenged Plans.

292.    Federal Defendants' failure to comply with notice and public comment requirements under NEPA, FLPMA, and NFMA is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

## SEVENTH CAUSE OF ACTION

**(Federal Defendants failed to take a "hard look" at the cumulative impacts of exempted renewable transmission lines in violation of NEPA)**

293.    Plaintiffs incorporate by reference each of the allegations set forth above.

294.    NEPA and its implementing regulations require federal agencies to take a "hard look" at the environmental impacts of proposed actions.  42 U.S.C. § 4332(c)(i).

295.    In taking a "hard look," an agency must identify and disclose to the public the impacts of a proposed action on the environment.  40 C.F.R. § 1502.1.

296.    Under NEPA, federal agencies must consider the direct, indirect, and cumulative impacts of a project.  40 C.F.R. §§ 1508.7, 1508.8, 1508.25(c).

297.    NEPA also requires that agencies' analysis of cumulative impacts be based upon high quality scientific information and created with professional integrity.  40 C.F.R. §§ 1500.1, 1502.24.

298.    CEQ regulations require agencies to analyze the "incremental impact of the action" together with "other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7.

299.    Federal Defendants failed to take a hard look at the cumulative impacts of exempt renewable electrical transmission projects in certain challenged plans.

300.    In total, these plans exempt approximately 1,600 miles of renewable transmission lines in six states.

301.    Federal Defendants acknowledged the potential impacts to greater sage-grouse from the exempted electrical transmission projects.  For example, the Wyoming 9-Plan Proposed LUPA/Final EIS states that "impacts would likely be greater in Colorado where the TransWest Express proposed route would impact approximately 26 miles in PACs (key habitats that are essential for Greater Sage-Grouse conservation) and 57 miles of PHMA in the BLM Little Snake and White River Field Offices.  This impact would be especially harmful to fringe Greater Sage-Grouse populations in Colorado, as some are less robust than those in Wyoming and southern Montana." Wyoming 9-Plan Proposed LUPA/Final EIS, Section 4.23.7, p. 4-563.

302.    Despite acknowledging these impacts, Federal Defendants failed to consider the impacts of the exempted renewable electric transmission projects in the Nevada, Idaho, Utah, and Northwest Colorado Proposed RMPAs/Final EISs, indicating simply that the electric transmission projects' cumulative impacts would be analyzed on a site-specific basis through the NEPA process. *See* Northwest Colorado Approved RMPA at 2-21.

303.    Although Federal Defendants acknowledged the "especially harmful" impact of electrical transmission projects on greater sage-grouse, the Nevada, Idaho, Utah, and Northwest

Colorado Approved RMPAs fail to analyze the impacts of these exempt projects on greater sage-grouse habitat and on other public land users and developers.

304.    The Approved Challenged Plans violate NEPA because they fail to take a hard look at the cumulative impacts of exempt projects.

305.    Federal Defendants' failure to take a hard look and failure to rely on high quality scientific data is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law in violation of NEPA and the APA.

## EIGHTH CAUSE OF ACTION

**(Federal Defendants failed to take a "hard look" at socioeconomic and cumulative impacts in violation of NEPA)**

306.    Plaintiffs incorporate by reference each of the allegations set forth above.

307.    NEPA and its implementing regulations require analysis of socioeconomic impacts.  *See* 40 C.F.R. §§ 1502.23, 1508.14 (human environment includes economic impacts). This includes providing the "economic and social effects of implementing each alternative . . . ." 43 C.F.R. § 1610.4-6.

308.    Federal Defendants failed to consider the direct, indirect and cumulative impacts the restrictive management prescriptions and requirements in the Approved Challenged Plans will have on existing and future oil and gas lessees' ability to develop minerals across the greater sage-grouse range.

309.    Federal Defendants failed to consider the direct, indirect and cumulative environmental impacts the Approved Challenged Plans will have on adjacent state and private lands through increased development and density on non-federal lands as a result of no surface occupancy restrictions, development prohibitions and limitations, and other restrictive requirements on federal lands.

310.    The federal prescriptions and requirements are restrictions on development and include imposing uniform lek buffer distances, incorporating NSO restrictions, limiting waiver and modification of stipulations, and imposing a "net conservation gain" mitigation standard within greater sage-grouse habitat.

311.    Federal Defendants failed to analyze the direct, indirect and cumulative negative economic impact the Approved Challenged Plans' development and leasing restrictions will have upon federal oil and gas royalty revenue in the United States Treasury, state treasuries' revenue in states including Colorado, Idaho, Montana, Nevada, North Dakota, South Dakota, and Utah, and to the local counties and communities.

312.    Federal Defendants failed to analyze the potential impacts the Challenged RODs and Challenged Approved Plans will have upon jobs and the local economies.

313.    Federal Defendants failed to take a hard look at the cumulative impacts of the management prescriptions and designations of each Approved Challenged Plan with the cumulative impacts of the remaining Approved Challenged Plans across the greater sage-grouse range. *See* 40 C.F.R. § 1508.7.

314.    Federal Defendants failed to take a hard look at the socioeconomic and cumulative impacts of the Approved Challenged Plans on existing federal oil and gas leases across the greater sage-grouse range, future oil and gas development across the greater sage-grouse range, and the impacts to federal, state and local tax bases and economies in violation of NEPA.

315.    Federal Defendants failed to explain why they did not analyze the potential impacts of the Approved Challenged Plans on jobs and federal, state and local tax bases and economies.

316.    The Approved Challenged Plans violate NEPA because they fail to take a hard look at socioeconomic and cumulative impacts.  40 C.F.R. §§ 1508.7, 1502.23, 1508.104.

317.    Federal Defendants' failure is arbitrary and capricious, and otherwise not in accordance with NEPA.

## NINTH CAUSE OF ACTION

**(Federal Defendants improperly cede authority over oil and gas operations in violation of the MLA and FLPMA)**

318.    Plaintiffs incorporate by reference each of the allegations set forth above.

319.    The Secretary of the Interior has delegated authority to lease public lands and administer oil and gas operations exclusively to BLM.  *See* 43 C.F.R. pt. 3100; Dep't of the Interior Departmental Manual, 235 DM 1 § 1.1(K) (Oct. 5, 2009).

320.    The BLM Director "shall carry out such functions and shall perform such duties as the Secretary may prescribe with respect to the management of the lands and resources under his jurisdiction according to the applicable provisions of [FLPMA] and any other applicable law."  43 U.S.C. §1731.

321.    Under BLM's delegated authority, BLM may attach lease stipulations to oil and gas leases and modify or waive these lease stipulations.  *See* 43 C.F.R. §§ 3101.1-3, 3101.1-4. ("A stipulation included in an oil and gas lease shall be subject to modification or waiver only if the authorized officer determines that the factors leading to its inclusion in the lease have changed sufficiently to make the protection provided by the stipulation no longer justified or if proposed operations would not cause unacceptable impacts." (emphasis added)).

322.    The Approved Challenged Plans provide for NSO lease stipulations for fluid mineral leasing within PHMA.

323.   Under the Challenged RODs and Approved Challenged Plans only single-use exceptions may be granted to these NSO lease stipulations, and only with the unanimous approval of BLM, the state game and fish agency, and FWS.

324.   Federal Defendants' requirement for unanimous authorization of an exception to allow oil and gas development within identified priority habitat subjugates BLM's exclusive and sole authority over oil and gas development.

325.   By granting a *de facto* veto power to FWS and state agencies over the availability of certain exceptions to lease stipulations, the Federal Defendants unlawfully delegated governmental authority from BLM to FWS and the state agencies in violation of FLPMA and the MLA, and unlawfully ceded authority expressly and solely delegated to the BLM.

326.   Federal Defendants' delegation of BLM's statutory authority is arbitrary, capricious, an abuse of discretion, and not in accordance with FLPMA or the MLA.

## TENTH CAUSE OF ACTION

### (Federal Defendants disparate treatment between EISs is arbitrary and capricious in violation of the APA)

327.   Plaintiffs incorporate by reference each of the allegations set forth above.

328.   The APA requires courts to set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."  5 U.S.C. § 706(2).

329.   In developing management prescriptions, BLM's resource management planning regulations require BLM to apply a "rational, consistently applied set of regulations and procedures" to maximize resource values for the public.  43 C.F.R. § 1601.0-2.

330.   The Challenged RODs and Approved Challenged Plans are the antithesis of rational, consistently applied management prescription regulations and procedures.

331.    Federal   Defendants   imposed   inconsistent   management   prescriptions   and requirements between the multiple Challenged RODs, associated Approved Challenged Plans, and underlying Final EISs.

332.    Many of the Approved Plans associated with the Challenged RODs impose a 3.1-mile NSO lek buffer from energy development infrastructure.

333.    However, variations exist within the

- Wyoming plans (0.6-mile);

- Colorado WRFO RMPA/Final EIS (0.6-mile); and,

- Idaho/SW Montana Approved ARMPA (0.6-mile for Montana once the State of Montana's disturbance calculation method is instituted and effective).

334.    The   inconsistent   lek   buffer   distances   apply   within   PHMAs,   which   have comparable habitat qualities and characteristics.

335.    The   Federal   Defendants   fail   to   provide   a   rational   explanation   as   to   why   the different Approved Plans impose expanded and inconsistent lek buffer distances based on individual state boundaries, regardless of comparable habitat and irrespective of the effectiveness of the lesser buffer distance.

336.    Many of the Approved Plans associated with the Challenged RODs impose a three percent disturbance cap on development within PHMAs.

337.    However, variations exist within the:

- Nevada/NE California Approved RMPA (no cap upon a finding that the project could result in a net conservation gain;

- Oregon Approved RMPA (one percent disturbance cap per new disturbance per decade, not to exceed three percent disturbance at any time);

- Idaho/SW Montana Approved RMPA (in Montana permits the standard three percent disturbance cap to increase to five percent once the State of Montana's disturbance calculation method is instituted and effective);

- Wyoming Plans (impose a five percent disturbance cap); and,

- Colorado's WRFO RMPA/Final EIS (two percent surface disturbance limitation).

338.    These inconsistent disturbance caps apply within PHMAs, which have comparable habitat qualities and characteristics.

339.    The Federal Defendants fail provide a rational explanation as to why the different Approved Plans impose these inconsistent disturbance caps based on individual state boundaries, regardless of comparable habitat and irrespective of the effectiveness of greater surface disturbance limitations.

340.    Many of the Approved Plans associated with the Challenged RODs impose a density cap of one energy and mining facility per 640 acres within PHMAs.

341.    However, BLM's Great Basin ROD does not impose a density cap for Nevada in the Nevada/NE California Approved RMPA.

342.    The Federal Defendants fail to provide a rational explanation as to why the different Approved Plans impose inconsistent density caps based on individual state boundaries, regardless of comparable habitat.

343.    Many of the Approved Plans associated with the Challenged RODs impose an adaptive management strategy, including soft and hard triggers in the Approved Plans.

344.    The North Dakota Approved RMPA, however, does not utilize an adaptive management strategy.

345.    The Federal Defendants fail to provide a rational explanation as to why the North Dakota Approved RMPA does not utilize an adaptive management strategy despite similarities with states that do utilize such a strategy.

346.    The Approved Plans impose inconsistent noise limitations in PHMAs, including:

- Nevada/NE California Approved RMPA (prohibits noise exceeding ten decibels above ambient sound levels at least 0.25 miles from active and pending leks, from two hours before to two hours after sunrise and sunset during the breeding season);

- Idaho/SW Montana Approved RMPA (prohibits noise over ten decibels adjusted from 6:00 p.m. to 9:00 a.m. within two miles of leks during lekking season); and,

- North Dakota Approved RMPA (prohibits noise in excess of ten decibels above ambient at sunrise at the perimeter of a lek during active lek season).

347.    These inconsistent noise stipulations apply within PHMAs, which have comparable habitat qualities and characteristics.

348.    The Federal Defendants fail to provide a rational explanation as to why different Approved Plans impose inconsistent noise stipulations based on individual state boundaries, regardless of comparable habitat.

349.    The Federal Defendants impose inconsistent timing limitation stipulations on disturbances related to oil and gas development, including:

- Utah Approved RMPA (February 15 to June 15);

- Northwest Colorado Approved RMPA (March 1 to July 15);

- Idaho/SW Montana Approved RMPA (during the nesting season and during winter in wintering areas);

- Wyoming Plans (March 15 to June 30); and,

- Colorado's WRFO PRMPA/Final EIS (December 1 to March 15; April 1 to July 15).

350.    The Federal Defendants fail provide a rational explanation as to why different Approved Plans impose inconsistent timing limitations in individual states, despite similar habitat; indeed, the Federal Defendants impose identical lek buffer distances in each of these states except Wyoming.

351.    Additionally, and without explanation, the Approved Challenged Plans only partially amend previously-existing greater sage-grouse conservation measures as "more restrictive land use allocations or decisions . . . made in existing RMPs . . . will remain in effect and will not be amended" by the Approved Challenged Plans.  *E.g.* Northwest Colorado Approved RMPA at 1-14.

352.    Federal Defendants fail to explain why certain management prescriptions and requirements within the Challenged RODs are imposed on a range-wide basis while other management prescriptions and requirements are not.

353.    Federal Defendants are treating comparable habitat conditions in an inconsistent manner without explanation and without any supporting analysis.  Consequently, parties may be operating within the same habitat conditions within or across state lines, but because of the state or land use plan boundaries, are subject to inconsistent management prescriptions and requirements depending on the side of the border on which they are operating.

354.    Federal Defendants fail to explain why such disparate treatment between similarly situated parties is warranted.

355.    This disparate treatment among and between the Challenged RODs—without explanation as to the reasoning behind this different treatment—is arbitrary, capricious, and an abuse of discretion.

## PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing, Plaintiffs Western Energy Alliance and the North Dakota Petroleum Council respectfully request that the Court enter judgment in their favor and against Defendants on each Claim for Relief set forth herein, and issue the following relief:

(a)    Order a remand of provisions within the Approved Challenged Plans amending regulations related to the availability of exceptions, waivers or modifications of lease stipulations and require Federal Defendants cure the legal violations of the APA formal rulemaking procedure;

(b)    Order a remand of provisions within the Approved Challenged Plans amending the regulations requiring compensatory mitigation and require Federal Defendants cure the legal violations of the APA formal rulemaking procedure;

(c)    Order a remand of provisions within the Approved Challenged Plans amending the regulations establishing a "net conservation gain" mitigation standard and require Federal Defendants cure the legal violations of the APA formal rulemaking procedure;

(d)    Order a remand of provisions within the Approved Challenged Plans amending the regulations and establishing specific lek buffer distances, timing limitations and noise buffers and require Federal Defendants cure the legal violations of the APA formal rulemaking procedure;

(e)    Order a remand of provisions within the Approved Challenged Plans addressing the TransWest Project, Gateway Projects, and Boardman Project, and require Federal Defendants undertake comprehensive and legally valid supplemental NEPA analysis and adoption of further amended or revised RODs (and Plan amendments or revisions) in order to cure the arbitrary and capricious decision to treat similarly situated industries disparately;

(f)    Order a remand of provisions within the Approved Challenged Plans addressing the imposition of sagebrush focal area habitat zones, uniform lek buffers, and a "net conservation gain" mitigation standard and require Federal Defendants undertake comprehensive and legally valid supplemental NEPA analysis and adopt further amended or revised RODs (and Plan amendments or revisions) in order to cure the violations of NEPA, FLPMA and NFMA;

(g)    Order a remand of provisions within the Approved Challenged Plans addressing the TransWest Project, Gateway Projects, and Boardman Project, and require Federal Defendants undertake comprehensive and legally valid supplemental NEPA analysis in order to take a "hard look" at the cumulative impacts of these exempt projects and cure the violations of NEPA;

(h)    Order a remand of oil and gas provisions within the Approved Challenged Plans and require Federal Defendants undertake comprehensive and legally valid supplemental NEPA analysis in order to take a "hard look" at the cumulative and socioeconomic impacts of the restrictions on oil and gas development and the impact those restrictions will have on federal, state and local economies;

(i)     Order a remand of provisions within the Approved Challenged Plans requiring unanimous authorization of an exception to an oil and gas lease stipulation and require Federal Defendants cure the legal violation of requiring BLM to cede its decision-making authority in violation of FLPMA and the MLA;

(j)     Order a remand of the disparate provisions within the Approved Challenged Plans and require Federal Defendants undertake comprehensive and legally valid supplemental NEPA analysis in order to and adopt further amended or revised RODs in order to cure the APA violations;

(k)     Enter such other declaratory and/or injunctive relief as Plaintiffs may specifically request hereafter;

(l)     Award Plaintiffs their reasonable costs, litigation expenses, and attorney's fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*.; and

(m)    Grant such further relief as the Court deems just and equitable.

DATED this 12th day of May, 2016.

BEATTY & WOZNIAK, P.C.

s/ Bret A. Sumner

Bret A. Sumner
bsumner@bwenergylaw.com
Theresa M. Sauer, ND Bar #07100
tsauer@bwenergylaw.com
Malinda Morain
mmorain@bwenergylaw.com
Michael Cross
mcross@bwenergylaw.com
BEATTY & WOZNIAK, P.C..
216 Sixteenth Street, Suite 1100
Denver, Colorado 80202-5115
Phone Number:  303-407-4499
Fax Number:  1-800-886-6566

ATTORNEYS FOR PLAINTIFFS
WESTERN ENERGY ALLIANCE
NORTH DAKOTA PETROLEUM COUNCIL